(No. 15259.—Decree affirmed.)

NELLIE I. MEES *et al.* Appellants, *vs.* MABEL STEFFEY *et al.* Appellees.

*Opinion filed October 20, 1923—Rehearing denied Dec. 6, 1923.*

1. DEEDS—*threats, duress or undue influence must be operative when deed is made.* Threats, duress or undue influence, in order to constitute ground for setting aside a deed, must be sufficient to overcome the will of the grantor and must be operative at the time the deed is made.

2. SAME—*when relation of parent and child does not raise presumption of fraud.* The relation of parent and child, after the parental dominion has ceased, does not raise any presumption of fraud or undue influence in a conveyance from child to parent, and parties claiming under such conveyance do not have the burden of proving that it was fairly and understandingly made.

3. SAME—*what not ground for setting aside sale of vested remainder.* In the absence of fraud or unfair dealing inadequacy of consideration is not ground for setting aside a sale of a vested interest in remainder.

4. SAME—*a conveyance is ordinarily valid without any consideration.* The owner of property may give it away if he desires, and, as between the parties, a voluntary conveyance, unaccompanied by any fraud, oppression, overreaching or unfair dealing, will not be set aside on the ground that there was no consideration for the deed.

5. SAME—*when deeds from adult children to parent will not be set aside.* Adult children, who at the urgent request of their father re-convey to him their vested remainder in land recently conveyed by him to them, cannot have their deeds set aside on the ground that there was no consideration therefor, the evidence not being sufficient to establish the allegations of threats and duress set out in their bill.

APPEAL from the Circuit Court of Stark county; the Hon. CHARLES V. MILES, Judge, presiding.

T. W. HOOPES, F. B. BRIAN, and J. H. ANDREWS, for appellants.

THOMAS J. WELCH, and JOHN W. FLING, JR., for appellees.

310—11

Mr. JUSTICE DUNN delivered the opinion of the court:

A decree of the circuit court of Stark county which sus-.
tained a demurrer to the bill in this case was reversed in
303 Ill. 115. Upon remandment an answer was filed, and
after a hearing the bill was again dismissed for want of
equity, and the complainants appealed.

The allegations of the bill are set out in the report of
the former appeal, and the substantial averments are that
by the importunities of their father and his false represen-
tations and threats of violence the complainants were in-
duced to convey to him, for an inadequate consideration,
an undivided two-thirds interest in 100 acres of land which
they owned as tenants in common, subject to a life estate
in their father and mother, the interest so conveyed being
worth $10,000. The answer was a general denial, and the
cause is to be decided on the merits on the evidence.

The facts established by the evidence are these: John
R. Blunt, the father of the complainants, obtained title to
the land in controversy on March 24, 1917, by a warranty
deed stating a consideration of $21,000. On June 5, 1917,
he conveyed the land to his three daughters, Nellie I. Mees
and Lizzie Hogg, the complainants, and Mabel M. Blunt,
who is a defendant to this suit by the name of Mabel M.
Steffey, having been subsequently married. These were his
only children. The deed reserved a life estate to himself
and his wife and was made for a nominal consideration of
one dollar and love and affection. By October he had re-
pented of this gift to his children. While there is no proof
that he ever made a direct demand for a reconveyance, he
made his wishes known in October to C. H. Hill, his wife's
brother. Mrs. Blunt was dangerously ill and her brother
went to see her at her home in Kewanee. When he was
leaving, Blunt came out with him on the porch and began
to cry. Hill tried to comfort him about his wife's condi-
tion, but Blunt told him that he was not crying about that,—
that it was about the deed, and if he had to deed away every-

thing he was no better than a pauper. He said they had to deed the land back, and if they didn't deed it back he would shoot and shoot to kill, and drew out some shells. Hill told him not to talk that way, and then Blunt turned to Hill and said that Hill had much influence with Tom and Lizzie Hogg, and Blunt would give Hill $25 if he would get them to deed the land back to him; that he would agree to give them a good deal more when he was through with it, but he wanted it back. Hill did not tell Blunt that he would talk to Lizzie and Tom, but a day or two afterward he was at their house and did talk to Lizzie and told her he was afraid that Blunt was getting worked up about it and would commit a crime. She was sick at that time and Hill said his information put her in a terrible condition,— it excited her greatly. He had another conversation with her at her residence a week or so afterward. While they were talking the dog was barking so that they could not understand much that was said. Tom started to go out of doors and Lizzie jumped up and said maybe it was pa. When Blunt offered Hill the $25 to get Tom and Lizzie to give the deed back, Hill said he didn't want to be mixed up in it. William N. Hill, another brother of Mrs. Blunt, was present at this conversation, and Blunt had two somewhat similar conversations with William, but these were not reported to the complainants or either of them. Bessie Hogg, Lizzie's sixteen-year-old daughter, also had a conversation with her grandfather in the kitchen of his house, in which he said he wanted the deed made back to him and if the people concerned would not make it back he would shoot to kill. He said he had nothing in his own name,—it was like being a pauper. He had no gun or revolver but he had some shells with him. Bessie's mother was in the kitchen at the time. She was not well and after the conversation was greatly agitated. In this conversation her grandfather was talking to Bessie by the kitchen stove. There was no argument between her grandfather and mother at that time.

He hinted around about wanting the deed given back; that he would like to have the land back and wanted it in his own name so he could use it in his lifetime. Before making the deed to her father Mrs. Hogg said she thought it best, to save life, to go and sign it back. Frank Peebles also had a conversation with Blunt, in which the latter said he was a pauper and wanted the money to use as long as he lived. He said he would give Peebles $500 if they would give the deed back to him. He said if Peebles talked right maybe they would sign back, and if they did not he would kill them. He said he wanted his money to speculate on and use for himself. There is no evidence that this conversation was reported to Mrs. Hogg. Thomas Hogg testified that he had a conversation with Blunt in the summer of 1917 in which Blunt said that he was a pauper and the girls should deed this property back to him, so that he could go ahead and manage and sell or whatever he wished to do, and that they would get their equal shares in the land and probably a whole lot more.

In December all three of the daughters executed a quit-claim deed of the land to their father. Mrs. Mees and her husband acknowledged the deed in North Dakota, where they lived, on December 12. Mrs. Hogg and her husband and Mabel Blunt acknowledged the deed on December 21 in Henry county, Illinois, and it was then delivered. Blunt was not present at its execution. Mrs. Hogg was then about forty years old and had been married and living away from her father's house twenty years. Mrs. Mees was about thirty years old and had been married and living in North Dakota several years. Mrs. Blunt died on January 26, 1918, and Blunt on February 26, 1920. He was about seventy years old, weighed about 110 pounds and his health was generally good. On July 10, 1919, he made a contract for the sale of the premises for $32,500 to Harley I. Mozingo, who assigned the contract to Jesse Wilkinson, and the latter is a party defendant to this suit. On

October 20, 1919, Blunt executed his will, which was admitted to probate after his death, by which he gave one-third of his property to his daughter Nellie I. Mees, $500 to Lizzie A. Hogg and the residue to Mabel M. Blunt.

The appellants contend that in this case fraud is presumed on account of the relation of the parties, the subject matter of the contract and the nature of the transaction; that a conveyance from a child to a parent is *prima facie* fraudulent, and the burden is on the parent who is the grantee to show the fairness of the transaction; and that the conveyance was secured by the threats and false representations of John R. Blunt. It is evident that the suit was begun upon the theory that the conveyance of the remainder to their father for an inadequate consideration was *prima facie* invalid, and cast upon those claiming under the conveyance the burden of showing that the conveyance was made upon an adequate consideration and was for the benefit of the complainants, for the original bill contained no allegation for setting the deed aside other than that it conveyed the remainder in fee to their father, that the remainder was worth $10,000, and the complainants did not receive a fair and adequate price for the land. Afterward an amendment was made to the bill, which charged that Blunt, to induce the complainants to make the deed, offered money to other persons if they would use their efforts to get the complainants to make the deed; that in order to secure the deed Blunt stated to complainants that he could not get the necessities of life on account of having only a life estate in the land, which was false and untrue; that Blunt also threatened the complainants with violent bodily injury if they would not make the deed to him and threatened to kill Mrs. Hogg if she refused to make the deed, and by his false representations and threats secured the deed from the complainants.

The evidence is entirely insufficient to sustain the charges of this amendment or to prove that the convey-

ance was obtained by threats, fraud, duress or undue influence. Where a contract has been obtained by threats of bodily harm made by one party, of such a character as in view of the surrounding circumstances were sufficient to overcome the mind of the other party and prevent him from exercising his free will, such threats are sufficient cause for avoiding the contract. There is no evidence of any representations or threats made or communicated to Mrs. Mees, who lived all the time in North Dakota, or of any duress or undue influence to which she was subjected. The general statements made by Blunt to the Hills and Bessie Hogg were not made directly to Mrs. Hogg. Her name was not mentioned. She was present in the kitchen when the statement was made to Bessie, but no unfriendly word appears to have been said to her by her father and no argument occurred between them. According to Bessie's account her grandfather merely hinted about wanting the deed back, and said he would like to have the land in his own name so he could use it in his lifetime. Mrs. Hogg was not greatly alarmed by these vaporings of her father, for they were reported to her by C. H. Hill six weeks, at least, before the deed was made. She lived on the farm with her husband, several miles from her father's home in Kewanee. When her uncle told her what her father had said, she said, "We better turn it over to him for his peace of mind," and said that her mother had been coaxing her to deed the land back. She did not, however, deed it back for six weeks. It is not shown that she ever had any direct communication with her father about it. Threats, duress or undue influence which will be sufficient to invalidate the execution of a deed must be sufficient to overcome the will of the grantor and must be operative at the time of the execution of the deed. This evidence does not show such a case and there is no evidence of fraud.

The question of constructive fraud by reason of the relation of the parties was disposed of on the former ap-

peal, when it was said that the relation of parent and child, where the parental dominion has ceased, does not raise a presumption of fraud or undue influence in a conveyance or gift from a child to a parent, and that the burden of proof is not on the appellees to show the transaction was fairly, voluntarily and understandingly made but is on the appellants to prove their bill. This is in accordance with the doctrine of the Supreme Court of the United States announced in *Jenkins* v. *Pye,* 12 Pet. 241, and *Towson* v. *Moore,* 173 U. S. 17. The doctrine formerly prevailed in England that heirs, reversioners and other expectants, during the lifetime of their ancestors and life tenants, are considered peculiarly liable to imposition and exposed to the temptation and danger of sacrificing their future interests to meet their present wants, and therefore are peculiarly entitled to the protection of a court of equity. In such cases fraud was inferred from mere inadequacy of consideration. (2 Pomeroy's Eq. Jur. sec. 953.) Though the earlier English cases recognized a distinction between mere expectancies and vested remainders, the rule was firmly established by the later decisions that the tenant of a vested remainder was in the same condition as an expectant heir, and his contract about his remainder would be treated in the same way as that of an expectant heir about his expectancy, and this rule continued until abolished in 1868 by statute. (31 and 32 Vict. chap. 4.) The rule has not been generally adopted in this country with reference to vested remainders and was by implication denied in *Jenkins* v. *Pye, supra,* though there was an opinion by Justice Catron upholding the English doctrine but concurring in the judgment on the ground of *laches.* In the absence of fraud or unfair dealing, inadequacy of consideration, alone, is not ground for setting aside a sale of a vested interest in remainder. This was held in *Cribbins* v. *Markwood,* 13 Gratt. 495, in which the court said: "Whatever principle may be adopted

in reference to contracts with expectant heirs secretly selling the chance of a parent's or some relation's bounty, it seems to me that the actual adult owner of a vested interest in property, whether in reversion or remainder, should not be reduced to the condition of pupilage from regard to any supposed rule of public policy or for the purpose of extending to him any particular protection. No such rule of public policy exists in this country, and all attempts to fetter the action of the owner by restricting his power of alienation operate injuriously to him. They lessen competition and so depreciate the market price of his property. There is no valid reason for making this an exceptional case. The contracts of such reversioners or remainder-men, like all other contracts, if made by those competent to contract, if they are not gained by ill-practice nor made against the laws, should be kept." In a similar case of the sale by a remainder-man of his interest for a disproportionate consideration, the Supreme Court of Pennsylvania held that inadequacy of consideration was insufficient to justify the cancellation of a conveyance except in the case of an heir expectant who anticipates his inheritance by selling it before he gets it; that the owner of property may sell it for very little or give it away for nothing if he thinks fit, and however unreasonable his conduct may seem, his will, alone, is sufficient to avouch the act. (*Davidson* v. *Little,* 22 Pa. 245.) This doctrine was approved in *Whelen* v. *Phillips,* 151 Pa. 312, and *In re Phillips' Estate,* 205 id. 511. The question was considered in *McAdams* v. *Bailey,* 169 Ind. 518, and after reviewing the decisions the conclusion announced was, that "there can be no doubt, under the authorities in this country, that mere inadequacy of consideration does not afford a sufficient reason for setting aside the conveyance of a contingent interest in property, or what approximates thereto, although the doctrine is doubtless otherwise as respects sales by expectant heirs of their supposed interest in the lands of living ancestors."

There is no pretense that there was an adequate consideration for the conveyance in this case or any consideration whatever. There was no bargain for the sale of the property. The conveyance was entirely voluntary. An owner of property may give it away without any consideration, and there is not the slightest doubt that a conveyance is ordinarily valid without any consideration. (2 Tiffany on Real Prop. sec. 438.) It is well settled that although voluntary conveyances are or may be void as to existing creditors, yet they are valid and effectual as between the parties and cannot be set aside by the grantor if he should become dissatisfied with the transaction. The law regards it as his own folly to have made such a conveyance and leaves him to bear the consequences without means of redress. (*Campbell* v. *Whitson,* 68 Ill. 240.) Mere inadequacy of consideration is not a distinct ground for equitable relief against the obligation of contracts and deeds, and, standing alone, is ordinarily of little weight as evidence of fraud, yet when it is accompanied with circumstances of overreaching, oppression or undue influence, or when through the ignorance, age, mental or physical condition of the grantor, or by misrepresentation, surprise or stress of financial circumstances, the grantor is led into an improvident bargain, equitable relief will be granted. (*Huiller* v. *Ryan,* 306 Ill. 88.) None of the circumstances of overreaching, oppression, undue influence, misrepresentation, surprise or stress of financial circumstances, ignorance, age or mental or physical condition of the grantors are present in this case. The grantors, pursuant to the urgent request of their father, released him from the effect of what he regarded as his improvident gift to them, by deeding the property back to him. Perhaps it was an unwise thing for them to do, but it was done voluntarily, knowingly and deliberately, and no ground is shown for setting aside the conveyance.

The decree of the circuit court of Stark county will be affirmed.

*Decree affirmed.*